(No. 78195.—Reversed and remanded.)

BROWN'S FURNITURE, INC., Appellee, v. RAYMOND WAGNER, Director of Revenue, *et al.*, Appellants.

*Opinion filed April 18, 1996.*

James E. Ryan, Attorney General, of Springfield (Barbara A. Preiner, Solicitor General, and Daniel N. Malato, Assistant Attorney General, of Chicago, of counsel), for appellants.

Mark A. Drummond, of Schmiedeskamp, Robertson, Neu & Mitchell, of Quincy, for appellee.

JUSTICE McMORROW delivered the opinion of the court:

In this appeal we are asked to decide whether Brown's Furniture, Inc. (Brown's Furniture), a retail furniture store located in Palmyra, Missouri, is compelled to collect Illinois use tax pursuant to the Use Tax Act (the Act) (35 ILCS 105/1 *et seq.* (West 1994)) on items which are purchased in its Missouri store and shipped into Illinois. The Department of Revenue of the State of Illinois (Department) audited Brown's Furniture's sales for the period from January 1, 1989, to October 31, 1989, and determined that it owed $47,460.62 in uncollected

use tax, interest and penalties. Brown's Furniture filed suit for injunctive relief in the circuit court of Sangamon County against the Director of Revenue, the Department, and the State Treasurer (collectively, the defendants)[1] . The suit contested the assessment of use tax liability. Following a two-day bench trial, the circuit court entered injunctive relief in favor of Brown's Furniture, holding that the Act was unconstitutional and that the Department was estopped from collecting the tax. Defendants appealed to this court. 134 Ill. 2d R. 302(a). For the reasons which follow, we reverse the judgment of the circuit court.

## BACKGROUND

The following facts were produced at trial and are largely undisputed. Brown's Furniture is located in Palmyra, Missouri, approximately 15 miles southwest of Quincy, Illinois. Illinois residents frequently patronize Brown's Furniture, and their purchases comprise approximately 30% of the store's total sales. On a regular basis, Brown's Furniture delivers items purchased by Illinois residents into Illinois in its own trucks. During the 10-month audit period at issue here, from January 1, 1989, to October 31, 1989, Brown's Furniture made 942 deliveries of its merchandise, valued at more than $675,000, in Illinois. Brown's Furniture collected neither Illinois use tax nor Missouri sales tax on these sales.

When Brown's Furniture delivers its merchandise in Illinois, its employees unload the furniture from the truck and place it without any further installation inside the customer's residence. If the furniture has

---

[1]Ken Zehnder is currently the acting Director of Revenue and Judy Baar Topinka is currently State Treasurer. Both officers are substituted for Raymond Wagner and Patrick Quinn, respectively, pursuant to section 2—1008(d) of the Code of Civil Procedure (735 ILCS 5/2—1008(d) (West 1994)).

been scratched during shipping, the delivery persons may correct the scratches by using a special furniture marker, but they do not make any additional repairs. Furniture which has been extensively damaged in transit is returned to the Missouri store and, after being repaired, is returned to Illinois. Brown's Furniture also picks up furniture for repair if a problem arises subsequent to delivery. In addition, though it occurs infrequently, Brown's Furniture accepts payment on delivery, including checks drawn on Illinois banks.

Brown's Furniture advertises extensively in Illinois. During the 10-month audit period, Brown's Furniture had 2,800 individual advertisements in Illinois media outlets. These outlets included two television stations located in Illinois, four radio stations and a Quincy, Illinois, newspaper. Brown's Furniture owns no property in Illinois, has no offices or plants in Illinois, and employs no permanent or part-time sales force in Illinois. Brown's Furniture has made use of the Illinois courts on at least one occasion by filing a small claims suit.

Prior to 1975, Brown's Furniture voluntarily collected Illinois use tax on deliveries which it made into Illinois. See 35 ILCS 105/6 (West 1994). In 1974, Brown's Furniture began receiving complaints from its Illinois customers that other Missouri stores were not collecting the use tax. In response, Brown's Furniture requested clarification of its tax collection duties from both the Department and from the Missouri Department of Revenue. By way of a letter dated September 15, 1975, the Department informed Brown's Furniture that it was under no obligation to collect Illinois use tax. Similarly, in a letter dated August 29, 1975, the Missouri Department of Revenue told Brown's Furniture that its deliveries into Illinois were "export sales" not subject to Missouri's sales tax. Accordingly, Brown's Furniture

collected neither Illinois use tax nor Missouri sales tax on its Illinois deliveries. In 1978, a Department agent visited Brown's Furniture in a personal capacity to purchase furniture. In an unofficial conversation with a Brown's Furniture vice-president, the agent confirmed that the store was not required to collect Illinois use tax.

In 1984, Harvey's Furniture, a retail furniture store located in Quincy, complained to the Department about Brown's Furniture's failure to collect the use tax. As an Illinois retailer, Harvey's Furniture was subject to the Retailers' Occupation Tax Act (35 ILCS 120/1 et seq. (West 1994)). The store also collected Missouri use tax on deliveries which it made into Missouri. In response to the complaint from Harvey's Furniture, the Department attempted to audit Brown's Furniture's sales. Brown's Furniture resisted the audit. In August 1984, accountants employed by Brown's Furniture sent a letter to the Department in which they maintained that Brown's Furniture's activities in Illinois did not justify requiring it to register as a use tax collector. The Department's response, dated October 9, 1984, indicated that Brown's Furniture was required to collect the tax. Thereafter, Brown's Furniture continued to correspond with the Department and to contest the attempted audit. Eventually, for reasons unclear from the record, the matter was dropped by the Department.

In 1985, the Act was amended to require use tax collection from out-of-state merchants who engage in activities in Illinois which would subject them to use tax collection responsibilities if engaged in within their own state. Pub. Act 84—430, § 1, eff. September 16, 1985, codified at 35 ILCS 105/2 (West 1994). At the time this legislation was enacted, Missouri required any out-of-state vendor who regularly delivered property into Missouri by means other than common carrier or the

United States mail to collect its use tax. Mo. Code Regs. tit. 12, § 10—4.085 (1989). Thus, under the amendment, Brown's Furniture was obligated to collect Illinois use tax. Brown's Furniture learned of the amendment and, on advice of counsel, registered with the Department to collect the tax. Through its attorneys, Brown's Furniture also wrote to the Department questioning the constitutionality of the amendment. The Department's reply, dated April 8, 1986, acknowledged possible constitutional problems with Missouri's position requiring use tax collection from out-of-state vendors. However, the Department's reply also stated that, in light of the amendment to the Act and Missouri's position on use tax collection, Brown's Furniture was required to register as an Illinois use tax collector.

From 1986 through 1988, Brown's Furniture collected and remitted Illinois use tax. During this time, several Illinois customers complained to Brown's Furniture that it was the only Missouri furniture store in the area which was collecting the tax. Some customers also accused Brown's Furniture of pocketing the collected use tax. In December 1988, Brown's Furniture phoned the Department's tax service desk to ask for clarification on whether it was required to collect the tax. In the phone call, Brown's Furniture described its operations in general terms, but did not specify the extent of its activities in Illinois. In response, Brown's Furniture was allegedly told that it did not have to collect the use tax and that it should mark its next return as "final." Brown's Furniture did so.

A short while later, the Department received a complaint from Harvey's Furniture in Quincy regarding Brown's Furniture's decision to cease collecting use tax. On this occasion, Harvey's Furniture had complained to its Representative in the General Assembly, Jeff Mays, who in turn had referred the complaint to the Depart-

ment. In April 1989, one of the Department's auditors contacted Brown's Furniture to discuss an audit of Brown's Furniture's sales. Brown's Furniture informed the auditor of its phone conversation with a Department employee at the tax service desk and its continuing objections to the Department's position that it was required to collect the use tax. Nevertheless, Brown's Furniture agreed to be audited. The audit began on October 31, 1989, and was concerned only with the imposition of use tax on deliveries made into Illinois during the 10-month period from January 1, 1989, to October 31, 1989. On the basis of the audit, the Department concluded that Brown's Furniture was liable for $47,460.62 in uncollected use tax, interest and penalties. Brown's Furniture paid the assessment under protest.

On March 23, 1990, Brown's Furniture filed a complaint for injunctive relief against the Department. After a two-day bench trial in February 1994, the circuit court of Sangamon County entered an injunction ordering a refund of the tax monies paid by Brown's Furniture. The court determined that there was insufficient nexus between Brown's Furniture and Illinois to justify imposing the responsibility of collecting the use tax and, therefore, that the Act, as applied to Brown's Furniture, contravened the commerce clause of the United States Constitution (U.S. Const., art. I, § 8). The court also held that the Act facially discriminates against interstate commerce. The court further concluded that the Act had not been "uniformly applied to all businesses in the same or similar situations" as Brown's Furniture and that, based on varying representations which it had made to Brown's Furniture, the Department was estopped from collecting the tax. Defendants' appeal ensued. 134 Ill. 2d R. 302(a).

## ANALYSIS

Illinois' use tax is imposed "upon the privilege of us-

ing in this State tangible personal property purchased at retail from a retailer ***." 35 ILCS 105/3 (West 1994). The tax functions as a necessary corollary to the Retailers' Occupation Tax Act (35 ILCS 120/1 *et seq.* (West 1994)), the principal means in Illinois for taxing the retail sale of tangible personal property. The purpose of the use tax is

> "primarily to prevent avoidance of the [retailers' occupation] tax by people making out-of-State purchases, and to protect Illinois merchants against such diversion of business to retailers outside Illinois." *Klein Town Builders, Inc. v. Department of Revenue*, 36 Ill. 2d 301, 303 (1966).

See also 2 J. Hellerstein & W. Hellerstein, State Taxation par. 16.01 (1992). The use tax is imposed at the same rate as the Retailers' Occupation Tax. 35 ILCS 105/3—10; 120/2—10 (West 1994).

The ultimate incidence of the use tax falls upon the consumer. However, because of the impracticality of collecting the tax from individual purchasers, the burden of its collection is imposed upon the out-of-state vendor. See *National Geographic Society v. California Board of Equalization*, 430 U.S. 551, 555, 51 L. Ed. 2d 631, 636, 97 S. Ct. 1386, 1389-90 (1977). In Illinois, section 3—45 of the Act provides the statutory mechanism for collection of the use tax. That section states, in part, that the tax "shall be collected from the purchaser by a retailer maintaining a place of business in this State ***." 35 ILCS 105/3—45 (West 1994).

Brown's Furniture contends that it is not a "retailer maintaining a place of business" in Illinois and thus is not subject to the provisions of the Act. Section 2 of the Act includes the following definition of "a retailer maintaining a place of business in this State":

> "A retailer having or maintaining within this State, directly or by a subsidiary, *** any agent or other representative *operating* within this State under the authority of the retailer or its subsidiary, irrespective of whether

such *** agent or other representative is located here permanently or temporarily, or whether such retailer or subsidiary is licensed to do business in this State." (Emphasis added.) 35 ILCS 105/2 (West 1994).

Because the Act does not provide a definition for the term "operating," we give that word its ordinary and popularly understood meaning in light of the statute's purpose. *In re Estate of Callahan*, 144 Ill. 2d 32, 43 (1991). "To operate" is to perform a work or labor. Webster's Third New International Dictionary 1580 (1993). When employees of Brown's Furniture made deliveries in Illinois during the 10-month audit period, they were "operating" within the State as that term is ordinarily understood. Thus, Brown's Furniture's deliveries in Illinois bring it within the ambit of the Act. We note that this construction of the Act is in accord with the policies of the majority of our sister states. See, *e.g.*, Ind. Code Ann. § 6—2.5—3—1(c)(2) (Burns 1995) (defining a retail merchant "engaged in business" in the state as one who delivers personal property within the state); Ky. Rev. Stat. Ann. § 139.340(2)(b) (Michie/Bobbs-Merrill 1995) (same); Wis. Stat. § 77.51(13g)(b) (1994) (same); see also *Good's Furniture House, Inc. v. Iowa State Board of Tax Review*, 382 N.W.2d 145, 147-49 (Iowa 1986).

In addition to contesting whether its activities bring it within the meaning of the Act, Brown's Furniture raises four other major issues in this appeal: that the Department's application of the Act violated the commerce clause; that Brown's Furniture's equal protection rights were violated; that the Department should be estopped from collecting the tax; and that the Act, as applied to Brown's Furniture, constitutes special legislation.

## I

All statutes are presumed to be constitutional. The

party challenging the validity of a statute bears the burden of clearly establishing any constitutional invalidity. *People v. Jeffries*, 164 Ill. 2d 104, 111 (1995). This court must construe legislative enactments so as to affirm their constitutional validity if it is reasonably possible to do so. *Jeffries*, 164 Ill. 2d at 111. We review *de novo* the circuit court's decision with respect to the constitutionality of the Act. *Wilson v. Department of Revenue*, 169 Ill. 2d 306 (1996).

The commerce clause of the United States Constitution gives Congress the power to "regulate Commerce *** among the several States." U.S. Const., art. I, § 8, cl. 3. The Supreme Court has consistently interpreted this express grant of congressional authority as implicitly containing a negative command, known as the dormant commerce clause, which limits the power of the states to tax interstate commerce even in the absence of congressional legislation. This construction, the Court has said, serves the "Commerce Clause's purpose of preventing a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179-80, 131 L. Ed. 2d 261, 268, 115 S. Ct. 1331, 1335 (1995).

Contemporary dormant commerce clause analysis does not prohibit all state taxation of interstate commerce but rather only that which is unduly restrictive or discriminatory. See *Jefferson Lines*, 514 U.S. at 179-83, 131 L. Ed. 2d at 268-71, 115 S. Ct. at 1335–37. To withstand an allegation that it has unconstitutionally burdened interstate commerce, a state tax must satisfy the four-part test articulated in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 51 L. Ed. 2d 326, 97 S. Ct. 1076 (1977). *Complete Auto* requires that the tax

(1) be applied to an activity with a substantial nexus with the taxing state, (2) be fairly apportioned, (3) not discriminate against interstate commerce, and (4) be fairly related to the services provided by the state. *Complete Auto*, 430 U.S. at 279, 51 L. Ed. 2d at 331, 97 S. Ct. at 1079. We will consider each element of the *Complete Auto* test in turn.

Substantial Nexus

The most significant recent Supreme Court opinion to define "substantial nexus" is *Quill Corp. v. North Dakota*, 504 U.S. 298, 119 L. Ed. 2d 91, 112 S. Ct. 1904 (1992). At issue in *Quill* was whether the State of North Dakota could assess a use tax obligation on the Quill Corporation, a mail-order firm engaged in the sale of office equipment and supplies. Quill did a substantial amount of business with North Dakota residents, but had no physical contacts with the state other than through the mail or common carrier.

Prior to *Quill*, the Supreme Court had held, in *National Bellas Hess, Inc. v. Department of Revenue*, 386 U.S. 753, 18 L. Ed. 2d 505, 87 S. Ct. 1389 (1967), that states could not impose use tax collection responsibilities upon mail-order firms without violating both the due process clause and the commerce clause. In *Quill*, North Dakota argued that the changes which had occurred in both due process and commerce clause analysis subsequent to *Bellas Hess* rendered that decision obsolete. See, *e.g., Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985) (corporation's physical presence within a state not a prerequisite for asserting state jurisdiction under due process clause); *Complete Auto*, 430 U.S. 274, 51 L. Ed. 2d 326, 97 S. Ct. 1076 (emphasizing importance of focusing on the practical economic effects of state taxation on interstate commerce, rather than on more formalistic approaches). Thus, North Dakota argued that even

though Quill had no physical presence in the state, its contacts and economic presence within North Dakota justified requiring it to collect the use tax.

The Supreme Court rejected the arguments of North Dakota. The Supreme Court began by observing that the due process clause and the commerce clause are "analytically distinct": while due process is centered on principles of fundamental fairness to individuals, the commerce clause focuses on "the effects of state regulation on the national economy." *Quill*, 504 U.S. at 312, 119 L. Ed. 2d at 106, 112 S. Ct. at 1913. Hence, "a corporation may have the 'minimum contacts' with a taxing State as required by the Due Process Clause, and yet lack the 'substantial nexus' with that State as required by the Commerce Clause." *Quill*, 504 U.S. at 313, 119 L. Ed. 2d at 107, 112 S. Ct. at 1913-14.

The Court agreed that under contemporary due process analysis, Quill had directed its solicitation and operational activities at North Dakota residents and therefore could be compelled, even in the absence of a physical presence, to collect the state's use tax. Accordingly, the Court overruled the due process holding of *Bellas Hess*. However, for purposes of commerce clause analysis, the Court reaffirmed the *Bellas Hess* rule forbidding the imposition of use tax collection duties upon an out-of-state vendor whose only contacts with a taxing state are via the mail or common carrier. The Court noted that the *Bellas Hess* rule should be retained because significant commercial benefits flowed from delineating a "discrete realm of commercial activity that is free from interstate taxation." *Quill*, 504 U.S. at 315, 119 L. Ed. 2d at 108, 112 S. Ct. at 1914. In addition, the Court observed that the *Bellas Hess* rule had "engendered substantial reliance" and "become part of the basic framework of a sizable industry" and, therefore, principles of *stare decisis* counseled in favor of its

retention. *Quill*, 504 U.S. at 317, 119 L. Ed. 2d at 110, 112 S. Ct. at 1916.

*Quill* thus established that an out-of-state vendor must be physically present within a state in order to meet the substantial nexus requirement of the *Complete Auto* test. *Quill* also expressly affirmed that the "slightest" physical presence within a state will not establish substantial nexus. *Quill*, 504 U.S. at 315 n.8, 119 L. Ed. 2d at 108 n.8, 112 S. Ct. at 1914 n.8 (Quill's title to the contents of " 'a few floppy diskettes' " in North Dakota did not meet substantial nexus requirement); see also *National Geographic Society v. California Board of Equalization*, 430 U.S. 551, 51 L. Ed. 2d 631, 97 S. Ct. 1386 (1977) (rejecting slightest physical presence standard of nexus).

Left unclear after *Quill*, however, is the extent of physical presence in a state needed to establish more than a "slight" physical presence. During oral argument, Brown's Furniture urged this court to require a substantial physical presence within this state before use tax obligations may be imposed. We decline to adopt such a requirement.

Recently, in *Orvis Co. v. Tax Appeals Tribunal*, 86 N.Y.2d 165, 654 N.E.2d 954, 630 N.Y.S.2d 680 (1995), the Court of Appeals of New York considered whether *Quill* mandated a substantial physical presence within the taxing state. At issue in *Orvis* was whether use tax obligations could be imposed upon two Vermont firms, neither of which had a permanent physical presence in New York: one of the firms sent its personnel into New York on visits to "as many as 19 wholesale customers on the average of four times a year," and the other sent employees into New York on 41 occasions during three years. *Orvis*, 86 N.Y.2d at 180, 654 N.E.2d at 962, 630 N.Y.S.2d at 688. The *Orvis* court noted that neither the Supreme Court's prior precedents nor the language of

*Quill* itself supported the position that a substantial physical presence is required. The *Orvis* court also noted that the adoption of a substantial physical presence requirement would necessarily mean case-by-case evaluations of factors involved with each out-of-state vendor, thereby undermining the principles of clarity and repose which *Quill* had offered as justification for retention of the bright-line, *Bellas Hess* rule. The *Orvis* court stated—correctly, we believe—the rule regarding substantial nexus:

> "While a physical presence of the vendor is required, it need not be substantial. Rather, it must be demonstrably more than a 'slightest presence' [citation]. And it may be manifested by the presence in the taxing State of the vendor's property or the conduct of economic activities in the taxing State performed by the vendor's personnel or on its behalf." *Orvis*, 86 N.Y.2d at 178, 654 N.E.2d at 960-61, 630 N.Y.S.2d at 686-87.

Having established this standard, the *Orvis* court concluded that the presence of both companies in New York was sufficient to justify imposition of use tax collection responsibilities. See also *In re Laptops Etc. Corp.*, 164 Bankr. 506 (D. Md. 1993) (rare, nonrecurring visits made by out-of-state vendor's agent into the taxing jurisdiction did not create a sufficient physical presence to establish substantial nexus). See generally L. Kulwicki, *Continuing State Trends in Nexus Enforcement After Quill: The Struggle to Define Substantial Nexus*, 6 State Tax Notes 345 (February 7, 1994) (collecting cases).

With the foregoing principles and decisions in mind, we now consider whether Brown's Furniture has a sufficient physical presence in Illinois to establish a substantial nexus with the State. While "[r]easonable minds surely can *** differ over what showing is required to make out a 'physical presence' adequate to justify imposing responsibilities for use tax collection" (*Quill*, 504 U.S. at 330-31, 119 L. Ed. 2d at 118-19, 112 S.

Ct. at 1921 (White, J., concurring in part & dissenting in part)), we believe that presence is shown here. According to a stipulation prepared by the parties, Brown's Furniture made 942 deliveries in Illinois during the 10-month audit period. Testimony at trial indicated that during a typical trip into Illinois, Brown's Furniture might make as many as five or six individual deliveries. Thus, during the audit period, Brown's Furniture was averaging between 15 and 18 trips into Illinois per month, or a minimum of about one every other day. We believe that by physically sending its representatives into Illinois on this regular and frequent basis, Brown's Furniture has established more than a slight physical presence within the State.

Indeed, it is apparent that Brown's Furniture has travelled well beyond the "safe harbor [created] for vendors 'whose *only* connection with customers in the [taxing] State is by common carrier or the United States mail.'" (Emphasis added.) *Quill*, 504 U.S. at 315, 119 L. Ed. 2d at 108, 112 S. Ct. at 1914. Through its deliveries, Brown's Furniture is physically present in Illinois on an almost continuous basis, directly competing with in-state retailers in establishing and maintaining a market for its furniture sales in Illinois. We conclude that Brown's Furniture has met the *Complete Auto* substantial nexus requirement. Accord *Orvis*, 86 N.Y.2d 165, 654 N.E.2d 954, 630 N.Y.S.2d 680. See also Va. Code Ann. § 58.1—612(C)(4) (Michie Supp. 1995) (out-of-state vendor subject to use tax collection when it delivers tangible personal property other than by mail or common carrier into the state more than 12 times during a calendar year); Code Me. R. § 08—125 (sales tax section Rule 311) (1994) (out-of-state vendor subject to use tax collection when it delivers into the state at least 12 times in a calendar year).

In support of its position that its activities in Illinois

are not sufficient to establish substantial nexus, Brown's Furniture relies primarily on *Miller Brothers Co. v. Maryland*, 347 U.S. 340, 98 L. Ed. 744, 74 S. Ct. 535 (1954). In *Miller Brothers*, the State of Maryland attempted to impose the obligation to collect its use tax on a Delaware furniture store. The store's sales to Maryland customers were all made in Delaware; it had no employees or agents soliciting sales in the taxing state. The company did not advertise directly in Maryland, but did occasionally send sales circulars to its Maryland customers. The store also delivered merchandise in Maryland, sometimes using its own trucks, and sometimes using common carriers. The Supreme Court concluded, solely on due process grounds, that Miller Brothers could not be compelled to collect the use tax. Because *Quill* made clear that under contemporary *due process* doctrine a company is no longer required to be physically present within a state before use tax collection duties may be imposed, the continued authority of *Miller Brothers* is in considerable doubt. See *Orvis*, 86 N.Y.2d at 175 n.2, 654 N.E.2d at 959 n.2, 630 N.Y.S.2d at 685 n.2.

Further, to the extent that *Miller Brothers* remains relevant precedent for the case at bar, it is factually distinguishable. The Supreme Court described Miller Brothers' activities in Maryland as

"the occasional delivery of goods sold at an out-of-state store with no solicitation other than the incidental effects of general advertising. Here was no invasion or exploitation of the consumer market in Maryland." *Miller Brothers*, 347 U.S. at 347, 98 L. Ed. at 749, 74 S. Ct. at 540.

In the instant case, Brown's Furniture's deliveries in Illinois were not "occasional" or sporadic. *Cf. Department of Revenue v. Share International, Inc.*, 20 Fla. L. Weekly 1911 (Fla. App. August 21, 1995), appeal docketed No. 86481 (Fla. September 18, 1995) (Texas mail-order company employees' attendance at Florida

seminars for three days in five different years insufficient to establish substantial nexus); *In re Laptops Etc. Corp.*, 164 Bankr. 506 (D. Md. 1993). Nor was Brown's Furniture's extensive advertising in Illinois media outlets "incidental." In addition, contrary to the situation in *Miller Brothers*, Brown's Furniture directly and actively solicited and procured the consumer market in Illinois. See *Orvis*, 86 N.Y.2d at 184, 654 N.E.2d at 964, 630 N.Y.S.2d at 690 (Bellacosa, J., dissenting, joined by Ciparick, J.) (contending that *Miller Brothers* remains relevant because of its analysis of economic exploitation of consumer markets). Therefore, we conclude that *Miller Brothers* is inapposite and presents no bar to our determination that Brown's Furniture has sufficient physical presence within Illinois to meet the substantial nexus requirement.

## Fairly Apportioned

The central purpose of the fair apportionment prong of the *Complete Auto* test is to prevent multiple taxation by "ensur[ing] that each State taxes only its fair share of an interstate transaction." *Goldberg v. Sweet*, 488 U.S. 252, 261, 102 L. Ed. 2d 607, 616, 109 S. Ct. 582, 588 (1989). Illinois' taxing scheme provides an exemption from use tax for tangible personal property which has been subjected to sales, purchase or use taxes in other states. 35 ILCS 105/3—55(d) (West 1994). In addition, the Department imposed the use tax only on those items which Brown's Furniture delivered in Illinois; it did not attempt to tax any deliveries that went to non-Illinois customers. Thus, there was no threat of multiple taxation. See *D.H. Holmes Co. v. McNamara*, 486 U.S. 24, 31-32, 100 L. Ed. 2d 21, 28, 108 S. Ct. 1619, 1623-24 (1988) (use tax scheme fairly apportioned when it provides credit for sales tax paid in other states, and when imposed only on merchandise delivered in-state); see also *Jefferson Lines*, 514 U.S. 175, 131 L. Ed. 2d 261, 115 S. Ct. 1331.

### Does Not Discriminate Against Interstate Commerce

In its order enjoining the Department from collecting the use tax, the circuit court concluded that the Act as amended discriminates against interstate commerce. This conclusion was based on statements made by State Senator Netsch, the sponsor of amendments which were made to the definition section of the Act in 1986. Pub. Act 86—261, § 1, eff. January 1, 1990, codified at 35 ILCS 105/2 (West 1994). During the legislative debates on the proposed amendments, Senator Netsch stated that the legislation was

> "particularly aiming at those who have a presence outside of the State, heavily sell and advertise into the State but get away with not paying the sales tax whereas your retailers in your community do have to pay the sales tax. *We're trying to help the Illinois based retailers*." (Emphasis added.) 86th Ill. Gen Assem., Senate Proceedings, May 22, 1986, at 261 (statements of Senator Netsch).

Illinois' use tax rate is equal to that of the Retailers' Occupation Tax applicable to the same tangible personal property purchased in state. 35 ILCS 105/3—10; 120/2—10 (West 1994). Thus, the most which the Act can require from out-of-state vendors is the collection of the same tax as the Illinois vendor. Accordingly, there is no merit to the circuit court's conclusion that the Act discriminates against interstate commerce. See *D.H. Holmes*, 486 U.S. at 32, 100 L. Ed. 2d at 28, 108 S. Ct. at 1624 (use tax does not discriminate against interstate commerce when imposed at same rate as in-state sales tax).

### Fair Relation to Services Provided by the State

The fair relation prong of *Complete Auto* requires that the "measure of the [use] tax be reasonably related to the taxpayer's presence or activities in the State." *Jefferson Lines*, 514 U.S. at 200, 131 L. Ed. 2d at 281, 115 S. Ct. at 1346. However, the fair relation prong does not require a "detailed accounting of the services

provided to the taxpayer on account of the activity being taxed ***." *Jefferson Lines*, 514 U.S. at 199, 131 L. Ed. 2d at 281, 115 S. Ct. at 1345. Indeed, interstate commerce may be made to " 'contribute to the cost of providing *all* governmental services, including those services from which it arguably receives no direct "benefit." ' " (Emphasis in original.) *Goldberg*, 488 U.S. at 267, 102 L. Ed. 2d at 620-21, 109 S. Ct. at 592, quoting *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 627 n.16, 69 L. Ed. 2d 884, 900 n.16, 101 S. Ct. 2946, 2958 n.16 (1981).

In the case at bar, the argument that the use tax is not fairly related to the services provided by Illinois is without merit. Illinois provides services which facilitate Brown's Furniture's sale of furniture within the State. Brown's Furniture benefits from public roads, police protection, a judicial system and all the other "usual and usually forgotten advantages conferred by the State's maintenance of a civilized society ***." *Jefferson Lines*, 514 U.S. at 200, 131 L. Ed. 2d at 281, 115 S. Ct. at 1346. These benefits are related to the use tax collected on deliveries made by Brown's Furniture into Illinois and are "justification[ ] enough for the collection of a tax." *Jefferson Lines*, 514 U.S. at 200, 131 L. Ed. 2d at 281, 115 S. Ct. at 1346; see also *D.H. Holmes*, 486 U.S. at 32, 100 L. Ed. 2d at 28, 108 S. Ct. at 1624.

The application of the Act to Brown's Furniture satisfies the four prongs of the *Complete Auto* test. We therefore conclude that Brown's Furniture has failed to establish a violation of the commerce clause.

## II

Brown's Furniture asserts that at the time of the audit period, the Department did not require other similarly situated Missouri retailers to collect Illinois use tax and, therefore, that the Department's "targeting" and "singling out" of Brown's Furniture denied it

the equal protection of the laws. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. In support of this position, Brown's Furniture points to a memo dated February 16, 1989, from the administrator of legal services at the Department to the manager of the audit bureau. The memo refers to the complaint made by Harvey's Furniture to Representative Mays and requests the audit department to "follow up" if a use tax return is not filed by Brown's Furniture in January 1989. Brown's Furniture also points to exhibits in the record which indicate that at the time of the audit period, none of its direct competitors had been audited by the Department.

It has long been established that the guarantee of equal protection applies not only to facial legislative classifications, but also to the administration of laws as well. See, *e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356, 30 L. Ed. 220, 6 S. Ct. 1064 (1886); *Kerasotes Rialto Theater Corp. v. City of Peoria*, 77 Ill. 2d 491, 498-99 (1979). Thus, it has been held that principles of equal protection are violated when the selective enforcement of a statute is "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456, 7 L. Ed. 2d 446, 453, 82 S. Ct. 501, 506 (1962). However, so long as a statute is rationally based, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." *Oyler*, 368 U.S. at 456, 7 L. Ed. 2d at 453, 82 S. Ct. at 506; *cf. Wayte v. United States*, 470 U.S. 598, 608, 84 L. Ed. 2d 547, 556, 105 S. Ct. 1524, 1531 (1985); *United States v. Batchelder*, 442 U.S. 114, 125, 60 L. Ed. 2d 755, 765-66, 99 S. Ct. 2198, 2205 (1979); *Dandridge v. Williams*, 397 U.S. 471, 486-87, 25 L. Ed. 2d 491, 502-03, 90 S. Ct. 1153, 1162-63 (1970); see also *Jacobs v. City of Chicago*, 53 Ill. 2d 421, 427 (1973).

Brown's Furniture offers no evidence to suggest that it was targeted by the Department for an invidious rea-

son, such as race, religion, or political beliefs. Moreover, in light of its decision to stop remitting the use tax after collecting it for two years, we are not persuaded by the argument of Brown's Furniture that the Department had no rational basis for undertaking the 1989 audit. The Department's legitimate objective of collecting revenue, coupled with its finite resources, necessarily requires it to exercise some discretion in selecting which tax collector to audit. The exercise of that discretion in the case at bar was neither discriminatory nor arbitrary. Therefore, we conclude that Brown's Furniture's equal protection claim is without merit.

## III

Brown's Furniture contends that the Department should be estopped from collecting the use tax and, mirroring the circuit court's reasoning, offers two justifications for such an estoppel. First, Brown's Furniture alleges that its vice-president, Jim Brown, was told in a phone conversation with the Department's tax service desk on December 30, 1988, that Brown's Furniture was not required to collect the tax. Second, Brown's Furniture notes that during its contacts with the Department it continuously received differing explanations of why its activities in Illinois required it to collect the use tax.

Generally, the doctrine of equitable estoppel may be invoked when a party reasonably and detrimentally relies on the words or conduct of another. *Dill v. Widman*, 413 Ill. 448, 455-56 (1952). However, against the State, estoppel is applied only to prevent fraud and injustice, and this is especially true when the public revenues are involved. *Jack Bradley, Inc. v. Department of Employment Security*, 146 Ill. 2d 61, 81 (1991); *Rockford Life Insurance Co. v. Department of Revenue*, 112 Ill. 2d 174, 185-86 (1986).

This court's reluctance to apply the doctrine of estoppel against the State has been motivated by the concern

that doing so "may impair the functioning of the State in the discharge of its government functions, and that valuable public interests may be jeopardized or lost by the negligence, mistakes or inattention of public officials." *Hickey v. Illinois Central R.R. Co.*, 35 Ill. 2d 427, 447-48 (1966). Reflecting these policy concerns in the revenue collection context, this court has refused to estop the State from reexamining a taxpayer's liability even when returns for the relevant tax period have been filed and approved. *People ex rel. Scott v. Chicago Thoroughbred Enterprises, Inc.*, 56 Ill. 2d 210 (1973); *Austin Liquor Mart, Inc. v. Department of Revenue*, 51 Ill. 2d 1 (1972). Similarly, this court has held that the Department was not estopped from taxing certain securities which, under a previous Department policy, had been exempt from taxation. *Rockford Life Insurance*, 112 Ill. 2d 174; see also *Jack Bradley*, 146 Ill. 2d at 81.

In the case at bar, the facts are insufficient to warrant application of estoppel against the State. According to Jim Brown's testimony, the Department employee to whom he spoke on the phone was unaware of the extent of the store's activities in Illinois. Under the general rule, estoppel cannot be asserted against a party not having knowledge of all relevant facts. *Dill*, 413 Ill. at 455-56; 31 C.J.S. *Estoppel* § 70 (1964). The State is not estopped by the mistakes made or misinformation given by the Department's employees with respect to tax liabilities. *Austin Liquor Mart*, 51 Ill. 2d at 5. Therefore, it would be inappropriate to impose the doctrine against the Department on the basis of the phone conversation. See also *Good's Furniture*, 382 N.W.2d at 150-51.

With respect to the Department's changing justifications for collecting the tax, we agree that they varied throughout the course of its dealings with Brown's Furniture. Although we do not condone the Department's failure to provide Brown's Furniture with an

explanation of why its activities created a substantial nexus with Illinois,[2] the Department was consistent in its determinations that Brown's Furniture was obligated to collect the use tax. In both its letter of October 9, 1984, and its letter of April 8, 1986, the Department explicitly concluded that Brown's Furniture was required to collect the use tax. Thus, regardless of the Department's changing rationales, there is no evidence to suggest that it fraudulently or unjustly misled Brown's Furniture into not collecting the tax. Therefore, under the circumstances presented here, the Department cannot be estopped from collecting the use tax.

## IV

Brown's Furniture argues that the Department's application of the Act rendered it "special legislation in all practicality." In support of this assertion, Brown's Furniture points to testimony given in an evidence deposition by State Senator Laura Donahue. Senator Donahue testified that she represents the 48th District, which includes the City of Quincy, and that she sponsored the 1985 amendment to the Act. The Senator also testified that Harvey's Furniture had complained to her about the failure of Brown's Furniture to collect the tax and that in the course of sponsoring the amendment, she cited Brown's Furniture as an example of an out-of-state retailer who was not collecting Illinois use tax.

---

[2]The confusion on behalf of the Department is perhaps not surprising, given that the Supreme Court itself has described its decisions limiting state taxation of interstate commerce as a " 'quagmire' " (*Quill*, 504 U.S at 315, 119 L. Ed. 2d at 108, 112 S. Ct. at 1915), an "impoverished territory" (*Tyler Pipe Industries, Inc. v. Washington Department of Revenue*, 483 U.S. 232, 265, 97 L. Ed. 2d 199, 225, 107 S. Ct. 2810, 2829 (1987) (Scalia, J., dissenting, joined by Rehnquist, C.J.)), and a "tangled underbrush" (*Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 457, 3 L. Ed. 2d 421, 426, 79 S. Ct. 357, 362 (1959)).

Senator Donahue further stated that the amendment was meant to have a general application and that it was not limited to Missouri or to retail furniture stores. In addition, the Senator testified that while working to pass the legislation, Senators from other border districts had cited examples of out-of-state retailers performing activities similar to Brown's Furniture's to illustrate the problems the amendment was meant to address. Based on Senator Donahue's testimony, Brown's Furniture contends that it was singled out, and that the Act, as applied, was special legislation. We disagree.

The special legislation section of the Illinois Constitution provides:

"The General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination." Ill. Const. 1970, art. IV, § 13.

This provision prohibits the General Assembly from conferring a special benefit or exclusive privilege on a person or class to the exclusion of others similarly situated. *In re Petition of the Village of Vernon Hills*, 168 Ill. 2d 117, 122 (1995). The provision does not proscribe all legislative classifications, only those which "arbitrarily, and without a sound, reasonable basis" discriminate in favor of a select group. *Illinois Polygraph Society v. Pellicano*, 83 Ill. 2d 130, 137-38 (1980).

Brown's Furniture cites to no authority in support of its argument that the selective application of a statute by an administrative agency renders that statute special legislation. Assuming, *arguendo*, that Brown's Furniture's proposition is correct, and that the application in the instant case benefited a select group (presumably those Missouri furniture retailers not audited), Brown's Furniture has nevertheless failed to show that the Department's application of the Act converted it to special legislation. A special legislation challenge gener-

ally is judged under the same standards applicable to an equal protection challenge. *Village of Vernon Hills,* 168 Ill. 2d at 123; see generally *Anderson v. Wagner,* 79 Ill. 2d 295 (1979). As discussed previously, the Department's audit of Brown's Furniture was neither discriminatory nor arbitrary and hence did not contravene principles of equal protection.

For the foregoing reasons the judgment of the circuit court is reversed and the cause is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*